United States District Court
Southern District of Texas
**ENTERED**
August 20, 2018
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| CRYSTAPHASE PRODUCTS, INC. | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 3:17–CV–00265 |
| | § | |
| CRITERION CATALYSTS & | § | |
| TECHNOLOGIES, LP; CRITERION | § | |
| CATALYST COMPANY; SHELL | § | |
| GROUP; AND SHELL GLOBAL | § | |
| SOLUTIONS, INC. | § | |
| | § | |
| Defendants. | ·§ | |

## MEMORANDUM AND RECOMMENDATION

Pending before the Court is Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint (the "Shell Group's Motion to Dismiss"). Dkt. 27. All dispositive pretrial motions in this case have been referred to this Court for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Dkt. 30. Having considered the motion, the responses, and applicable law, the Court RECOMMENDS that the Shell Group's Motion to Dismiss be GRANTED IN PART and DENIED IN PART.

## I.  BACKGROUND

Crystaphase Products, Inc. ("Crystaphase") brings this suit against Criterion Catalysts & Technologies, LP; Criterion Catalyst Company; Shell Group; and Shell Global Solutions, Inc. (collectively the "Shell Group") for patent infringement under

patent laws of the United States, 35 U.S.C. § 1 *et seq.*, and for violations of the Lanham Act, 15 U.S.C. § 1051 *et seq.*

Crystaphase is a Texas-based company that supplies reactor solutions for the hydrocarbon processing industry.  In this lawsuit, Crystaphase alleges that the Shell Group has been promoting, offering for sale, and selling "solutions" that involve the use of OptiTrap Medallion ceramic units for fluid distribution in a chemical reactor.  These medallions include multiple ellipsoidal openings.  Crystaphase owns two United States Patents of methods using ceramic units including multiple ellipsoidal openings for fluid distribution in a chemical reactor.[1]  Crystaphase also alleges that even though the Shell Group promotes, offers for sale, and sells solutions involving the OptiTrap Medallions, the Shell Group does not utilize such medallions in the solutions sold to its customers.  Instead, the Shell Group allegedly utilizes "poorer performing" units that use triangular openings ("Penta Ring units") instead of the ellipsoidal openings.  Crystaphase contends that the Shell Group does not inform the market or customers that it made the substitutions.  Crystaphase alleges that by promoting, offering for sale, and selling solutions purported to use ellipsoidal OptiTrap Medallions, and swapping the units with "poorer performing" Penta Ring units, the Shell Group misrepresents the nature, characteristics, and qualities of its goods and services.  Moreover, Crystaphase asserts it is consequently forced to compete in a market against promoted solutions involving products that were never delivered to customers.  Additionally, Crystaphase alleges that

---

[1] United States Patent Nos. 8,062,521 ("the '521 patent") and 9,101,863 ("the '863 patent").

the Shell Group's customers are misled to believe they are purchasing solutions that use ellipsoidal units equivalent to the OptiTrap Medallions offered by Crystaphase.

## II.    THE 12(b)(6) STANDARD

A Rule 12(b)(6) motion tests the formal sufficiency of the pleadings and is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). The court must accept the factual allegations of the complaint as true, view them in a light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor. *See id.* To defeat a motion to dismiss filed pursuant to Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). Although Rule 12(b)(6) is a powerful tool to use in expediting the judicial process and excising court calendars of cases in which there are no judicially cognizable claims, it is a disfavored motion and is rarely granted." *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986).

## III.   ARGUMENT

**A.   CRYSTAPHASE'S METHOD PATENT INFRINGEMENT CLAIMS (COUNTS I AND II)**

In Counts I and II of the Second Amended Complaint ("Complaint"), Crystaphase alleges that the Shell Group has directly infringed its '521 and '863 patents by selling or offering to sell Crystaphase's patented methods.[2]   The Shell Group moves to dismiss Counts I and II, arguing that Crystaphase failed to allege that the Shell Group "sells" or "offers to sell" *performance* of the method patents, and Crystaphase failed to allege a legally cognizable "offer to sell" because promotional materials are not "offers" as a matter of law.   Crystaphase argues in response that it has sufficiently pled its method claims, and its method claims are not limited to the promotional materials cited in the Complaint.

Before discussing the parties' arguments, the Court first describes the method patents involved in this case.

**The '521 and '863 Patents.**   The '521 and '863 method patents each contain the following summary description of the patents:

> The method of the present invention for removing contaminants from an organic-based feed stream, in a chemical reactor may include the steps of providing a layer of ceramic filter units, at least some of the ceramic filter units should have a plurality of openings extending therethrough, at least some of the openings having a shape selected from the group consisting of ellipses or trisoids, the layer of ceramic filter units being in an amount sufficient to filter some or all of the contaminants from the organic-based feed stream, and passing the organic-based feed stream through the layer of ceramic filter units.   The organic-based feed stream may be an organic-

---

[2] Method patents are also known as process patents.

> based liquid, a vapor phase, or both, and the contaminants may include dirt, iron oxide, iron sulfide, asphaltenes, coke fines, catalyst fines, sediments, other entrained foreign particulate matter or polymer precursors such as diolefins.

Dkt. 22-2 at 9; Dkt. 22-3 at 8.   The specifics related to the summary description are contained in the various claims made in each patent.   Each patent contains multiple claims, with slight differences.   For the purpose of this discussion, the Court provides the language from two of the claims, which together provide a fair characterization of the steps required to perform the '521 and '863 patent methods:

15    What is claimed:
      1. A method of fluid distribution in a chemical reactor comprising the steps of:
      providing a layer of a plurality of ceramic filter units, at least some of the ceramic filter units including a body
20    having a substantially annular outer peripheral shape, a central opening extending through the body, and at least three elliptical openings extending through the body and positioned between the central opening and an outer periphery of the body so that a combination of the central
25    opening and the at least three elliptical openings define a plurality of fluid flow passageways extending through the at least some of the plurality of ceramic filter units;
      contacting an organic-based feed stream with the layer of the plurality of ceramic filter units; and
30    subdividing the organic-based feed stream into a plurality of smaller fluid streams by passing the organic-based feed stream through the plurality of fluid flow passageways prior to the organic-based feed stream contacting a catalyst bed in the chemical reactor.
35    2. A method as defined in claim 1, further including the steps of: removing contaminants from a contaminated organic-based feed stream; and
      providing a decontaminated and uniformly spread organic-based feed stream to a catalyst bed for further processing
40    in the chemical reactor.

5

Dkt. 22-2 at 13.  This detailed language is consistent with the summary description of the

method Crystaphase alleges in its Complaint:

> In connection with such offerings, Defendants have offered for sale and
> sold solutions using Criterion's OptiTrap Medallion ceramic filter unit in
> accordance with a method wherein:
> 46.1.  a layer of such units is provided inside a chemical reactor;
> 46.2.  an organic-based feed stream is contacted with the layer;
> 46.3.  the feed stream is subdivided into a plurality of smaller
> streams as it passes through the openings in the units forming
> the layer;
> 46.4.  the plurality of smaller streams are uniformly spread across
> the layer as they  pass through the units;
> 46.5.  contaminates are removed from the feed stream; and
> 46.6.  the decontaminated feed stream is provided to a catalyst bed
> for further  processing in the chemical reactor.

Dkt. 22 at 21–22.

With this understanding of the patents involved in this case, the Court turns to the

relevant legal authority and the Shell Group's arguments.

**What is method patent infringement?**   To state a claim for direct patent

infringement, a plaintiff must allege that the defendant, "without authority[,] makes, uses,

offers to sell, or sells [the] patented invention."  35 U.S.C. § 271(a); *see also Hewlett–*

*Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1469 (Fed. Cir. 1990).  "An 'offer

for sale' sufficient to give rise to liability for patent infringement must meet the

traditional contract law definition of that term.  Thus, [a] defendant must communicate a

manifestation of willingness to enter into a bargain, so made as to justify another person

in understanding that his assent to that bargain is invited and will conclude it." *Superior*

*Indus., LLC v. Thor Glob. Enters. Ltd.*, 700 F.3d 1287, 1294 (Fed. Cir. 2012) (citations

and internal quotation marks omitted).  "[A] sale includes the concept of a transfer of title

6

or property . . . . [and] also requires a thing capable of being transferred." *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1319 (Fed. Cir. 2005) (internal quotation marks omitted). "[I]n every infringement analysis, the language of the claims, as well as the nature of the accused product, dictates whether an infringement has occurred." *Fantasy Sports Props., Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1118 (Fed. Cir. 2012).

"A method patent claims a number of steps . . . ." *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111, 2117 (2014). "Direct infringement [of a method patent] under § 271(a) occurs where all steps of a claimed method are performed by . . . a single entity." *Akamai Techs., Inc. v. Limelight Networks, Inc.* ("Akamai V"), 797 F.3d 1020, 1022 (Fed. Cir. 2015) (citing *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1379–81 (Fed. Cir. 2007)). Because infringement of a method patent is predicated on *performance* of the method—i.e., "use" of the patented method—it is unclear whether a method patent can be offered for sale or sold. "Neither the Federal Circuit nor the Supreme Court has ever recognized that one may infringe a method claim by selling or offering to sell a service that performs the method." *Wright's Well Control Servs., LLC v. Oceaneering Int'l, Inc.*, No. CV 15-1720, 2017 WL 3706344, at *3 (E.D. La. Aug. 28, 2017). The Federal Circuit has twice expressly declined to answer this seemingly fundamental question. *See Ricoh Co., Ltd. v. Quanta Comput. Inc.*, 550 F.3d 1325, 1335 (Fed Cir. 2008) (explaining due to the facts in the case that "we need not determine whether a process may ever be sold so as to give rise to liability under § 271(a)"); *NTP, Inc.*, 418 F.3d at 1320–21 ("We need not and do not hold that method claims may not be infringed under the 'sells' and 'offers to sell' prongs of section 271(a)."). Consequently,

the district courts are split on whether an offer to sell or the sale of a patented method can give rise to liability under § 271(a).

Some courts have held that a method claim can only be infringed by use of the patented method. *See, e.g., Isis Pharm., Inc. v. Santaris Pharma A/S Corp.*, No. 3:11-CV-2214-GPC-KSC, 2014 WL 2531973, at *3–4 (S.D. Cal. June 4, 2014); *W.L. Gore & Assocs., Inc. v. Medtronic, Inc.*, 874 F. Supp. 2d 526, 544–45 (E.D. Va. 2012); *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 695 F. Supp. 2d 680, 688 (S.D. Ohio 2010); *Ricoh Co., Ltd. v. Quanta Comput., Inc.*, 579 F. Supp. 2d 1110, 1123 (W.D. Wis. 2007), *aff'd in part and vacated in part*, 550 F.3d 1325 (Fed. Cir. 2008); *Transocean Offshore Deepwater Drilling, Inc. v. GlobalSantaFe Corp.*, 400 F. Supp. 2d 998, 1011–12 (S.D. Tex. 2005).

Other courts have interpreted the Federal Circuit's failure to close the door on "offers to sell" and "sells" claims as an indication those claims remain viable under § 271(a). *See, e.g., WesternGeco L.L.C. v. ION Geophysical Corp.*, 869 F. Supp. 2d 793, 798–99 (S.D. Tex. 2012), *rev'd in part on reconsideration*, 2012 WL 1708852 (S.D. Tex. May 15, 2012); *Optigen, LLC v. Int'l Genetics, Inc.*, 777 F. Supp. 2d 390, 403 (N.D.N.Y. 2011); *CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 667 F. Supp. 2d 29, 36–37 (D.D.C. 2009).

In this case, the Shell Group assumes that Crystaphase's method claims under the "offers to sell" and "sells" prongs of § 271(a) exist under current law, and focuses its attention on the specific allegations that are required to sustain such claims. Thus, the Court need not wade into the murky waters of whether the "offers to sell" or "sells" prongs of § 271(a) have any role to play in an allegation of method patent infringement.

For the purposes of resolving the instant motion, the Court simply assumes, along with the Shell Group, that the claims do exist.

**What exactly constitutes an offer to sell or sale of a method patent?**   The pleading requirements of a direct infringement claim based on the "offers to sell" and "sells" prongs of § 271(a) are less than clear—in large part because of the uncertainty regarding the viability of the claims.   Because the Court assumes that such claims exist, the Court looks to the opinions of district courts that have allowed such claims for guidance regarding pleading requirements.

In *CLS Bank Int'l*, the court stated that "one who 'sells' or 'offers to sell' each and every step of a patented method infringes the patent."   667 F. Supp. 2d at 37.   In *WesternGeco L.L.C.*, relying in part on *CLS Bank Int'l*, the Court found that "it is clear that the alleged infringer must sell the performance of the process itself in order for the sale to be actionable as direct infringement."   869 F. Supp. 2d at 799.   The court in *Optigen, LLC* also followed *CLS Bank Int'l* to reach a similar conclusion.   *See* 777 F. Supp. 2d at 402–03 (rejecting defendant's argument the "offers to sell" or "sells" prongs of § 271(a) do not apply to method patents "[f]or the reasons articulated . . . in *CLS Bank*").   Based on current authority, *performance* seems to be the key component of a method patent infringement claim; and in cases based on the "offers to sell" or "sells" prongs of section 271(a), a plaintiff must show that the infringer *sold or offered to sell its performance of all steps of the patented method*.   *See WesternGeco L.L.C.*, 869 F. Supp. 2d at 799 ("Because it cannot actually perform [Plaintiff's] patented methods, and does not offer to do so, [Defendant] does not sell or offer to sell the performance of those

9

methods."); *Ricoh Co.*, 550 F.3d at 1335 (recognizing a distinction between "a sale of . . . instructions to perform a process rather than performance of the process itself"). In other words, in cases brought under the "offers to sell" and "sells" prongs of § 271(a), it seems it is not the act of performing all of the steps of the method—as in "use" cases—that results in infringement, it is the offer to sell or selling of *the transactional obligation to perform all steps of the method* that results in infringement.[3]

Consequently, at this motion to dismiss stage (assuming that the "offers to sell" and "sells" prongs of § 271(a) apply to method claims), the Court must determine whether Crystaphase has plausibly alleged that the Shell Group offered to sell or sold its obligation to perform all the steps of Crystaphase's patented method.[4]

---

[3] This interpretation of existing law has been shared by at least one academic, who has described the state of the law regarding method patents as follows:

> While liability may be possible when an infringer makes, uses, offers for sale, sells or imports a claimed invention, if the invention is claimed in such a way that its limitations are only met when the invention is actually put into operation—i.e., some performance of the steps of a method—then offering for sale or selling the patent invention must be tightly limited to only circumstances involving the mandatory performance of those steps by the commercial transaction or offer itself.
>
> . . . .
>
> . . . If one is to be liable for "selling" or "offering for sale" the claimed method, then, that transaction itself must actually require the performance of the claimed steps. . . . If the steps are not, and will not as a matter of transactional obligation, be performed, there has been no direct infringement.

Jason Rantanen, *The Exceptional Nature of Method Claims: A Response to Professor Holbrook*, 102 IOWA L. REV. ONLINE 293, 304–05 (2017) (footnotes omitted).

[4] To be clear, the construction adopted here holds true to the very structure of § 271(a). As explained by one court:

> The language of the statute and the cases make it clear that expanding the list of infringing activities in sections 271(a) . . . to include an "offer to sell" rather than merely a "sale" protects a patent holder at an earlier stage of infringing activity.

**Crystaphase has not plausibly alleged a method claim based on the "offers to sell" and "sells" prongs of § 271(a).** In its Complaint, Crystaphase alleges that the Shell Group offers to sell and sells solutions for operating chemical reactors, and such solutions involve the Shell Group providing its customers with components (OptiTrap Medallions) and, possibly, directions and other guidance to assist the customer in operating their reactors in accordance with each step of Crystaphase's patented methods. Crystaphase does not allege anywhere in the Complaint that the Shell Group offered to sell or sold its obligation to perform each step of Crystaphase's patented method for its customers. In response to the Shell Group's Motion to Dismiss, Crystaphase readily concedes that it has not alleged that the Shell Group offered to sell or sold its obligation to perform each step of Crystaphase's method patent:

> The issue is not whether [the Shell Group] offers to perform the patented methods for others, but whether [the Shell Group's] sale and offer for sale of custom-developed solutions embodying patented methods infringes.

---

The patent holder no longer has to wait for an actual infringing sale before filing suit. Rather, the patent holder can sue its competitor for infringement at an earlier stage, when there is an offer to make an infringing sale. However, the expansion of the statute to include the earlier stage of an infringing activity, the offer to sell as well as the actual sale, means that the sale for which the offer is made must itself be an act of infringement.

*Quality Tubing, Inc. v. Precision Tube Holdings Corp.*, 75 F. Supp. 2d 613, 623–24 (S.D. Tex. 1999). Under the construction adopted in this opinion, the different interests described by the *Quality Tubing, Inc.* court remain protected: the offeror infringes the method patent by offering to sell its performance of all steps of the method (assuming the "offer" satisfies the traditional contract law definition of that term); acceptance of such an offer completes the sale, thereby constituting an additional act of infringement; and finally, if the offeror ultimately performs all steps of the patented method, that conduct will constitute an additional act of infringement by "use" of the patented method.

11

. . . The Complaint alleges that [the Shell Group] has engaged in the development, offering and sale of solutions that embody the patented methods.

Dkt. 28 at 18.

At oral argument, Crystaphase explained its claim more fully than alleged in the Complaint:

> [B]ased on the information we have, what the Shell Group does is they will meet with a customer and they will say, "We need to implement a solution for you. What problems do you have,—what do you need to have resolved or addressed with your reactor," and *they will develop a solution* which, in many instances, involves a process step *where you will use* these OptiTrap medallions, which are the products they identify as having the ellipsoidal unit, to distribute and filter chemicals as they flow through a reactor, and then they *supervise and assist and guide* in the installation, delivery, and assembly of that equipment that they have. They then *provide instructions* on how to operate it with processes on what to do. They then *engage in continuing monitoring of the process after that's done.*[6]

Dkt. 39 at 15–16 (emphases added). Again, Crystaphase did not assert that the Shell Group offered to sell or sold its obligation to perform each step of Crystaphase's method patent.

In the Complaint, by way of example, Crystaphase points to the Shell Group's promotional materials that advertise solutions, which it claims teaches, encourages, and promotes infringement of its patented method, including the use of the OptiTrap Medallion. But, as noted by the Shell Group, even the promotional material attached to

---

[6] The conduct Crystaphase described at oral argument seems strikingly similar to the type of allegations ordinarily made in conjunction with direct infringement claims based on a joint infringement theory. *See, e.g., Akamai V*, 797 F.3d at 1022–1023. However, Crystaphase has not advanced an allegation of joint infringement.

the Complaint does not contain any assertion by the Shell Group that its solutions include its obligation to perform each step of Crystaphase's method patent—i.e., its operation of the prospective customer's chemical reactor in accordance with the method patent.

At best, accepting Crystaphase's allegations as true and construing all inferences in its favor, Crystaphase has alleged that the Shell Group may arguably perform some of the steps of the method patents, and directs and guides its customers in performing others. This is simply insufficient to allege a direct infringement claim. Although the Federal Circuit has resisted providing clarity on whether "offers to sell" and "sells" claims exist, or even what may constitute such claims, it has been very clear on what does not constitute a sale or offer to sell: "performance of at least *some* of the recited steps of the asserted method claims as a service for its customers cannot be considered to be selling or offering to sell the invention covered by the asserted method claims." *NTP, Inc.*, 418 F.3d at 1321 (emphasis added). Consequently, Counts I and II must be dismissed.[7]

## B.   CRYSTAPHASE'S LANHAM ACT CLAIM (COUNT III)

The Shell Group seeks to dismiss Crystaphase's Lanham Act claim for three separate reasons: (1) it is barred by the doctrine of laches; (2) Crystaphase has failed to adequately plead a literally false representation, or the materiality of any impliedly false representation; and (3) Crystaphase lacks statutory standing. Before the Court examines each of these arguments in detail, it is worthwhile to provide a brief overview of a false advertising claim under the Lanham Act.

---

[7] Because the Court finds Crystaphase's allegations insufficient, even construing the promotional materials in the light most favorable to Crystaphase, the Court need not decide whether the Shell Group's promotional materials rise to the level of an "offer to sell" as a matter of law.

Section 43(a)(1)(B) of the Lanham Act, codified at 15 U.S.C. § 1125, provides, in relevant part:

> (1) Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> . . . .
>
>> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B). The Fifth Circuit has "interpreted this section of the Lanham Act as providing protection against a myriad of deceptive commercial practices, including false advertising or promotion." *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495 (5th Cir. 2000) (citations and internal quotation marks omitted).

A prima facie case of false advertising under the Lanham Act requires a plaintiff to establish five elements:

> (1) that the defendant made a false statement of fact about its product in a commercial advertisement; (2) that the statement actually deceived or has a tendency to deceive a substantial segment of its audience; (3) the deception is likely to influence the purchasing decision; (4) the defendant caused the false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result.

*Logan v. Burgers Ozark Cty. Cured Hams, Inc.*, 263 F.3d 447, 462 (5th Cir. 2001) (citation and brackets omitted).

In connection with its Lanham Act claim, Crystaphase alleges that the Shell Group's "promotion, of solutions using the OptiTrap Medallion unit, constituted a false

and/or misleading description and representation of fact because during the relevant time period [the Shell Group] did not actually deliver, and had no intention of delivering, any such units in response to the sale of such solutions." Dkt. 22 at 30.  In plain, simple English, Crystaphase alleges that images of ellipsoidal medallions in the Shell Group's promotional materials are misleading because the Shell Group does not utilize ellipsoidal medallions in its customers' reactors, but rather utilizes triangular medallions.

### 1.   Laches

The Shell Group first argues that the defense of laches bars Crystaphase's Lanham Act claim.  "Laches is commonly defined as an inexcusable delay that results in prejudice to the defendant." *Conan Props., Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 153 (5th Cir. 1985).  The defense of laches requires proof of three elements: "(1) delay in asserting a right or claim; (2) that the delay was inexcusable; [and] (3) that undue prejudice resulted from the delay." *Armco, Inc. v. Armco Burglar Alarm Co., Inc.*, 693 F.2d 1155, 1161 (5th Cir. 1982).

"The Lanham Act does not contain a statute of limitations.  As a result, federal courts refer to analogous state statutes of limitations to aid in determining what length of delay is excusable for purposes of laches." *Bernardo Footwear, LLC v. Ashley Nettye, Inc.*, No. H-11-2057, 2012 WL 1076252, at *4 (S.D. Tex. Mar. 28, 2012) (citations and internal quotation marks omitted).  The most analogous Texas statute of limitations for a Lanham Act claim is the four-year limitations period for fraud claims. *See Derrick Mfg. Corp. v. Sw. Wire Cloth, Inc.*, 934 F. Supp. 796, 805 (S.D. Tex. 1996) (applying Texas's

four-year limitations period to Lanham Act claims); *Mary Kay, Inc. v. Weber*, 601 F. Supp. 2d 839, 859–60 (N.D. Tex. 2009) (same).

The Shell Group argues that the Lanham Act claim is "barred by laches in light of [Crystaphase's] over a decade-long delay in raising any objection to [the Shell Group's] use of images of medallions with ellipsoidal openings in publicly and readily available promotional materials." Dkt. 27 at 3. In response, Crystaphase contends that it "did not know—and had no way of knowing the images [of ellipsoidal medallions contained in the Shell Group's promotional materials] were false and misleading—until after it filed its original complaint." Dkt. 28 at 15. Only after this lawsuit was filed, Crystaphase argues, did it learn that the Shell Group was employing bait-and-switch tactics, selling triangular medallions instead of the ellipsoidal medallions featured in its promotional materials. *See* Dkt. 22 at 28 ("Because [the Shell Group] did not inform and never publically informed their customers, their competitors, or the market that they were substituting the commodity units in place of the promoted OptiTrap Medallion units, the damages suffered by Crystaphase as a result of [the Shell Group's] conduct [was] inherently undiscoverable.").

Crystaphase's argument is compelling. Since "'[t]he period for laches begins . . . when the plaintiff knew or should have known' of the defendant's injurious conduct," it is premature to dismiss Crystaphase's Lanham Act claim on a motion to dismiss when, as here, there is a real factual dispute as to when Crystaphase "knew or should have known" of the Shell Group's alleged misrepresentations. *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 899–900 (5th Cir. 2016) (quoting *Elvis Presley Enters.,*

16

*Inc. v. Capece*, 141 F.3d 188, 205 (5th Cir. 1998)).  To be clear, laches may, in fact, ultimately bar Crystaphase's claims.  The Court is simply reluctant to make such a determination at this early stage of the case without considering a fully developed record. *See McDaniel v. Gulf & S. Am. S.S. Co.*, 228 F.2d 189, 192 (5th Cir. 1955) (Because laches is an equitable doctrine, "[t]he existence of laches is a question of fact to be decided by the court after weighing the equities as they appear from the facts of each case."); *Cashman Equip. Corp. v. Rozel Operating Co.*, No. 08-363-C-M2, 2010 WL 3385117, at *5 (M.D. La. Apr. 3, 2010) ("[t]he existence of laches involves an exercise of discretion by the trial court and should not be determined by a mere reference to and a mechanical application of the statute of limitations"); *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 773 (Fed. Cir. 1995) ("Laches is not established by undue delay and prejudice.  Those factors merely lay the foundation for the trial court's exercise of discretion.") (internal quotation marks and emphasis omitted).

Even if the Court held that Crystaphase inexcusably delayed in asserting a Lanham Act claim, the laches defense requires the Shell Group to establish that undue prejudice resulted from the delay. *See Armco, Inc.*, 693 F.2d at 1161.  In order to show prejudice, the Shell Group must show "a delay which cause[d] a disadvantage in asserting and establishing a claimed right or defense." *In re Bohart*, 743 F.2d 313, 327 (5th Cir. 1984). At the motion to dismiss stage, the Court is limited to reviewing the four corners of the Complaint. *See Morgan v. Swanson*, 659 F.3d 359, 401 (5th Cir. 2011) ("At this early pleading stage, our factual universe is bounded by the four corners of the complaint."). From merely reviewing the face of the Complaint, it is impossible to conclude that the

17

Shell Group has been unduly prejudiced by Crystaphase's delay in bringing suit. *See Jaso v. The Coca-Cola Co.*, 435 F. App'x 346, 356 (5th Cir. 2011) (reversing finding of laches at the motion to dismiss stage because "Jaso's complaint facially [does not] establish any undue prejudice to Defendants from his delay"); *Bd. of Comm'rs of the Port of New Orleans v. New Orleans Terminal, LLC*, No. 11-2899, 2013 WL 5934609, at *3 (E.D. La. Oct. 31, 2013) ("The issue[] of . . . prejudice raised in Fitorio's claim of laches necessitate[s] a fact intensive inquiry, well beyond the face of the pleadings."). Because the Court would need to look beyond the four corners of the Complaint to determine if the Shell Group has been unduly prejudiced, a Rule 12(b)(6) dismissal on the basis of laches is not warranted.

### 2.    Crystaphase Adequately Alleges a Lanham Act Claim

The Fifth Circuit has noted that the "[t]he law governing false advertising claims under section 43(a) of the Lanham Act is well settled." *Pizza Hut, Inc.*, 227 F.3d at 495. To prevail on a Lanham Act false advertising claim, "a plaintiff must demonstrate that the commercial advertisement or promotion is either literally false, or that if the advertisement is not literally false, it is likely to mislead and confuse consumers." *Id.* (citations and brackets omitted). "[W]hen the statements of fact at issue are shown to be literally false, the plaintiff need not introduce evidence on the issue of the impact the statements had on consumers. In such a circumstance, the court will assume that the statements actually misled consumers." *Id.* at 497 (citations omitted). However, when a plaintiff argues that the defendant's messaging was misleading, but not literally false, the

plaintiff "must also introduce evidence of the statement's impact on consumers, referred to as materiality." *Id.* at 495 (citations omitted).

With respect to its false advertising claim under the Lanham Act, Crystaphase's main complaint is that the Shell Group's promotional materials use images of medallions with ellipsoidal openings, but the company provides customers with solutions utilizing medallions with triangular-shaped openings.   An example of the type of promotional material that Crystaphase finds misleading is as follows:



Dkt. 27 at 21.   The Complaint alleges that the Shell Group's commercial advertising materials, such as the image reprinted above,

> misrepresent[ed] the nature, characteristics and qualities of [Crystaphase's] goods and services [by]
>
> (a)      . . . falsely represent[ing] that the ceramic top bed units used in [the Shell Group's] solutions included ellipsoidal openings and a central circular opening when the actual characteristics of the products delivered by [the Shell Group] did not include such openings; and
>
> (b)      . . . falsely represent[ing] that the ceramic top bed units used in [the Shell Group's] solutions performed in a chemical reactor in a manner substantially like ceramic units having ellipsoidal outer openings and a circular central opening, when they did not.

Dkt. 22 at 26. Crystaphase further contends that the Shell Group's false and misleading representations have resulted in lost sales.

The Shell Group argues that the Lanham Act claims should be dismissed because Crystaphase "fails to plausibly allege [the Shell Group] made a literally false representation about medallions selected for its reactor solutions, and also fails to plausibly allege the materiality of any impliedly false representations about such medallions." Dkt. 27 at 17–18. Although the photographs in the promotional materials unquestionably show ellipsoidal medallions, the Shell Group contends that the written description accompanying the photographs accurately describes the operational characteristics (such as void space, crush strength and density) of the medallions actually utilized as part of the solutions the Shell Group offers its customers. As a result, the Shell Group claims the use of ellipsoidal images in the promotional materials is not literally or impliedly false.

"When construing the allegedly false or misleading statement to determine if it is actionable under section 43(a) [of the Lanham Act], the statement must be viewed in the light of the overall context in which it appears." *Pizza Hut*, 227 F.3d at 495 n.5. In this case, the overall context in which the promotional materials were disseminated is the marketplace for solutions for operating chemical reactors, and, more specifically, the use of medallion ceramic units for fluid distribution in chemical reactors. Needless to say, this is not a context in which most individuals—including federal judges—possess a great deal of basic knowledge and understanding. The Shell Group argues that a customer of solutions for operating chemical reactors would ignore the images in the promotional

20

materials and rely solely on the written descriptions, which it emphasizes are completely true and accurate. The Shell Group might be correct. But, given that context is so important in determining whether a statement is literally false or misleading, the Court is hesitant at this preliminary stage, without the benefit of any extrinsic evidence, to declare that the Shell Group's promotional materials are—or are not—literally false or misleading. *See Wysong Corp. v. APN, Inc.*, 889 F.3d 267, 272 (6th Cir. 2018) ("In sum, as the district court rightly held, *context matters*.") (emphasis in original);[8] *Fink v. Time Warner Cable*, 714 F.3d 739, 742 (2d Cir. 2013) (when "determining whether a reasonable consumer would have been misled by a particular advertisement, *context is crucial*") (emphasis added). All the Court can do at the Rule 12(b)(6) stage is ask whether, in light of the overall context, the facts in the Complaint support a plausible inference that the challenged promotional materials misled a significant number of reasonable consumers. *See Iqbal*, 556 U.S. at 678. The Complaint certainly alleges that there are both literally false and misleading statements, and provides detailed factual allegations suggesting that the highly specialized marketplace for providing solutions for

---

[8] The Shell Group submitted the Sixth Circuit's recent opinion in *Wysong* as supplemental authority in support of its effort to dismiss the Lanham Act claims. The Court finds the *Wysong* case to be readily distinguishable. In *Wysong,* the Sixth Circuit affirmed the district court's Rule 12(b)(6) dismissal of a false advertising claim involving pet-food packaging because common sense dictated how reasonable consumers would view the pet-food packaging. As the Sixth Circuit noted: "Common sense dictates that reasonable consumers are unlikely to expect that dog food is made from the same meat as people eat." *Id.* at 272. By contrast, the context in which the alleged false statements in this case must be evaluated is much more complicated and thorny. In short, the Court cannot simply utilize its common sense to determine whether the statements relating to the highly specialized market for providing solutions for operating chemical reactors are literally false or misleading. The Court needs to look beyond the face of the Complaint to fully understand and appreciate the context in which the statements arose.

operating chemical reactors would view such statements as literally false or misleading. Therefore, the Court finds that the Complaint contains factual allegations that, when accepted as true, set out a plausible claim for relief. *See Twombly*, 550 U.S. at 555–556. That being said, the Shell Group is certainly entitled, after a reasonable time for the parties to conduct discovery, to argue at the summary judgment stage that the challenged statements are not literally or impliedly false. At that time, the Court will be able to fully assess the context for which the statements arose and issue an educated opinion on whether the challenged statements are, in fact, literally or impliedly false.

The Shell Group also complains that Crystaphase fails to sufficiently allege materiality of any impliedly false statement because the Complaint does not allege "that the purchasing decisions of the relevant consumers—customers seeking reactor solutions—are likely to be influenced by images of ellipsoidal medallions." Dkt. 27 at 22. The Court respectfully disagrees. The Complaint is replete with allegations that the Shell Group's false and misleading representations directly impacted customer purchase decisions. For example, Crystaphase alleges as follows:

> 58. The Defendants' false and misleading representations and descriptions as described herein are material, in that they are likely to influence a customer's purchasing decision. Purchasers of top bed ceramic units and/or solutions of the type offered by Defendants are aware that the characteristics of a top bed unit, including for example, the number, type and shape of the openings in the unit, can have an impact on the performance of such units in a reactor. As such, the shape of the openings in a ceramic unit is a material factor for such customers in determining whether to use such units—or a solution using such units—in a reactor.

> 59. As a direct competitor of Defendants with respect to the sale of top-bed ceramic units. Crystaphase is within the class that may invoke claims of a violation of the Lanham Act because it has, and likely has, suffered an

injury to a commercial interest in sales or business reputation proximately caused by Defendants' misrepresentations.

60.     Defendants' false and misleading descriptions and representations have resulted in injury to Crystaphase. As one example, Defendants' false and misleading representations have caused Crystaphase to lose sales in its ceramic unit products. Specifically, based on Crystaphase's knowledge of the market, there are customers who would have purchased (or requested the solutions provider to purchase) top bed ceramic grading products from Crystaphase had they known that the products to be delivered by the Defendants were the poorer-performing commodity products.

Dkt. 22 at 26–27.  To avoid dismissal, a complaint must contain "only enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570. Crystaphase's Lanham Act claim clears that low threshold.  Drawing all justifiable inferences in Crystaphase's favor as the Court must at this time, the Court finds that Crystaphase has pled sufficient facts to properly state a Lanham Act claim.

### 3.     Statutory Standing

The Shell Group next argues that the Complaint should be dismissed because Crystaphase has failed to establish "statutory standing" under the Lanham Act.

As a preliminary matter, the term "statutory standing" is somewhat of a misnomer because the concept is not jurisdictional and "does not implicate . . . the court's statutory or constitutional power to adjudicate the case." *Lexmark Int'l, Inc. v. Static Control Components*, 134 S. Ct. 1377, 1387 n.4 (2014) (citations and emphasis omitted). *See also CGM, LLC v. BellSouth Telecomms., Inc.*, 664 F.3d 46, 52 (4th Cir. 2011) ("[S]tatutory standing . . . is perhaps best understood as not even standing at all."). The question presented in a "statutory standing" case is simply whether the plaintiff has a cause of

action under the statute at issue.   In this case, the inquiry is straightforward: has Crystaphase met the requirements for bringing suit under the Lanham Act?

In *Lexmark*, the United States Supreme Court set forth a two-part test for determining whether a plaintiff can sue under the Lanham Act: (1) the "zone-of-interest test" and (2) the "proximate cause requirement." 134 S. Ct. at 1388–94.

**"Zone-of-Interest Test":**   The "zone-of-interest test" is used to determine whether a particular plaintiff falls within the class of plaintiffs that the Lanham Act protects and whom Congress authorized to sue.   *See id.* at 1388–90.   In the false advertising context, Congress' goal was to protect persons engaged in commerce against unfair competition.   *See id.* at 1389.   Thus, "to come within the zone of interests in a suit for false advertising under § 1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales."   *Id.* at 1390.   The "zone of interest" test is not a particularly demanding one, and the benefit of the doubt goes to the one alleging the cause of action.   *See id.* at 1389.   "[T]he test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized the plaintiff to sue."   *Id.* (citation and internal quotation marks omitted).

At this juncture, Crystaphase easily satisfies the "zone-of-interest test."   It has alleged that the Shell Group is a direct competitor who has induced customers to purchase its products instead of Crystaphase's products.   Crystaphase further alleges that it has suffered economic injury through lost sales and that it suffered injury to its reputation because the triangular medallions supplied by the Shell Group did not perform

as well as Crystaphase's ellipsoidal medallions.  Although the Shell Group contends that Crystaphase's allegations are conclusory and that the Shell Group cannot possibly be a competitor, the Court finds that Crystaphase has adequately pled that it comes within the class of plaintiffs authorized to sue under § 1125(a).  Moreover, Crystaphase's alleged injuries—lost sales and damage to its business reputation—fall within the zone of injuries protected by the Lanham Act.

**"Proximate Cause Requirement":**  The "proximate-cause requirement" for statutory standing "generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct." *Lexmark*, 134 S.Ct. at 1390.  To satisfy this requirement, "a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* at 1391.  "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the Court] presume[s] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (citation and internal quotation marks omitted).

In the Complaint, Crystaphase has clearly alleged lost sales and reputational injury flowing "directly from the [alleged] deception wrought by [the Shell Group's] advertising." *Lexmark*, 134 S.Ct. at 1391.  According to Crystaphase, it lost sales because customers would have purchased the ellipsoidal medallions from Crystaphase had they known that the Shell Group was delivering poorer-performing medallions.

Moreover, Crystaphase claims that its reputation suffered because customers equated the poorer-performing triangular medallions supplied by the Shell Group with the ellipsoidal medallions sold by Crystaphase. Accordingly, at this early stage in the case, the allegations set forth in the Complaint are sufficient to satisfy the *Lexmark* "proximate cause requirement." *See Global Tubing LLC v. Tenaris Coiled Tubes LLC,* No. 4:17-CV-3299, 2018 WL 3496739, at *6 (S.D. Tex. July 20, 2018) (denying motion to dismiss false advertising claims because the complaint, though general, sufficiently alleged injury and causation as required by *Lexmark*); *Greater Houston Transp. Co. v. Uber Techs, Inc.,* No. 4:14-0941, 2015 WL 1034254, at *15 (S.D. Tex. Mar. 10, 2015) (same).  Although the Court concludes that Crystaphase "has *alleged* an adequate basis to proceed under § 1125(a), it cannot obtain relief without *evidence* of injury proximately caused by [the Shell Group's] alleged misrepresentations.  [The Court] hold[s] only that [Crystaphase] is entitled to a chance to prove its case." *Lexmark*, 134 S.Ct. at 1395 (emphasis in original). Count III (the Lanham Act claim) survives the motion to dismiss.

## IV. CONCLUSION AND RECOMENDATION

For the reasons stated above, the Court RECOMMENDS that the Shell Group's Motion to Dismiss be GRANTED IN PART and DENIED IN PART.  The patent infringement claims (Counts I and II) should be dismissed and the Lanham Act claim (Count III) should proceed.

The Clerk shall provide copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13.

Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

SIGNED at Galveston, Texas, this ___ day of August, 2018.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE